**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| BEIN MEDIA GROUP LLC,<br><br>                    Plaintiff,<br>vs.<br><br>BEIN.COM, BEIN.BIZ, BEIN.CO,<br>BEIN.EVENTS, BEIN.IN, BEIN.MEDIA,<br>BEIN.MOBI, BEIN.PRO, BEIN.TEL,<br>BEIN.TV, BEINCHANNEL.COM,<br>BEINCHANNELS.COM,<br>BEINENTERTAINMENT.COM,<br>BEINFILMS.COM, BEINHOSTING.COM,<br>BEINSERVICES.COM AND ONBEIN.COM<br><br>                    Defendants *in rem*. | Civil Action No. 18-CV-11061-DJC |

<u>**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE
SETTLEMENT AGREEMENT**</u>

Plaintiff beIN Media Group LLC ("beIN" or "Plaintiff") submits this Memorandum of

Law in Support of its motion to enforce the settlement agreement reached by beIN and Mr.

Honza Jan Zicha ("Mr. Zicha") the registrant and owner of the Defendant Domain Names

<bein.com>, <bein.biz>, <bein.co>, <bein.events>, <bein.in>, <bein.media>, <bein.mobi>,

<bein.pro>, <bein.tel>, <bein.tv>, <beinchannel.com>, <beinchannels.com>,

<beinentertaiment.com>, <beinfilms.com>, <beinhosting.com>, <beinservices.com> and

<onbein.com> ("the <bein.com> domain names").

## I.      <u>INTRODUCTION</u>

This is an *in rem* action under the Anticybersquatting Consumer Protection Act

("ACPA"), 15 U.S.C. § 1125(d).

The registrant of the <bein.com> domain names is Mr. Zicha, who lives in England. beIN initiated this *in rem* action in response to Mr. Zicha's bad faith attempts to extort money from beIN.  beIN owns the trademark to "beIN" and is in the business of broadcasting sporting events, including the World Cup.  Shortly before the World Cup began on June 14, 2018, Mr. Zicha threatened to sell the <bein.com> domain names to an entity called beoutQ if beIN did not agree to pay Mr. Zicha over $500,000 for the <bein.com> domain names.  Mr. Zicha knew that beoutQ had already cost beIN millions of dollars in lost revenues by pirating beIN's broadcasts around the world, as was discussed in a front-page article in the New York Times on May 10, 2018, titled, "The Brazen Bootlegging of a Multibillion-Dollar Sports Network."  *See* <https://www.nytimes.com/2018/05/09/sports/bein-sports-qatar-beoutq.html>

On May 31, 2018, beIN filed a Motion for Preliminary Injunction in this Court and requested an emergency expedited hearing before the World Cup started on June 14, 2018.  *See* ECF Nos. 8–9.  On June 1, the Court granted beIN's request for an expedited hearing and set the motion hearing for June 8.  *See* ECF No. 12.

Mr. Zicha was served with the complaint, motion for preliminary injunction, and order setting the hearing for June 8, *see* ECF Nos. 10, 14–15, but Mr. Zicha never appeared in this action and never responded to the complaint or motion for preliminary injunction.  Instead, Mr. Zicha contacted beIN directly and asked to meet in person in London on June 5th (shortly before the preliminary injunction hearing scheduled for June 8th).

On June 5th, beIN and Mr. Zicha met in person in London and reached a settlement agreement, the material terms of which were confirmed thereafter via email.  In reliance on this agreement, beIN notified this Court that the parties had agreed to the terms of a settlement.  The preliminary injunction hearing scheduled for June 8th was subsequently taken off the calendar

and the Court entered a Settlement Order of Dismissal, "without prejudice to the right, upon good cause shown within sixty (60) days, to reopen the action if settlement is not consummated." *See* ECF No. 18.

The email from Mr. Zicha on June 5th contains all material terms of the settlement, and constitutes a valid contract, ending this litigation.  In particular, after the in-person settlement agreement, beIN sent Mr. Zicha an email confirmation stating, "You agree to transfer and assign immediately all beIN-related domain names that you have registered, control, or own" in exchange for the subsequent dismissal of the litigation (with each side bearing its own fees and costs).  In response, Mr. Zicha wrote, "I agree."  Thus, Mr. Zicha unequivocally agreed to the settlement agreement, both in person and by email.  Nonetheless, Mr. Zicha is now refusing to sign the formal papers transferring all of the domain names and ending this litigation.  Instead, Mr. Zicha is once again demanding money before he will transfer all of the "bein" domain names to beIN.

Accordingly, beIN respectfully requests that the Court enforce the June 5th settlement by issuing an order directing the registrar to transfer the Defendant domain names to beIN without further delay, consistent with the *in rem* remedies provided by the ACPA.  The registrar of the Defendant domain names is located in this district and, as required by the ACPA, has already tendered to this Court complete control and authority regarding the disposition of the defendant domain names.  *See* ECF No. 17.

## II.    FACTS

The following is a summary of the relevant facts, which were also discussed in more detail in the Complaint and Motion for Preliminary Injunction that were served on Mr. Zicha before the settlement on June 5th.  *See* ECF Nos. 1, 8.  For ease of reference, the Memorandum

in Support of the Motion for Preliminary Injunction is attached as an exhibit (hereinafter "P.I. Mot.").

beIN is a global leader in TV production, distribution, and media rights.  First Andrews Decl., ¶4.  beIN broadcasts over 7,500 hours of live content per month across 43 countries, 5 continents, and 60 channels.  First Andrews Decl., ¶5.  In the United States, beIN broadcasts via major cable systems including Comcast and Time Warner Cable.  First Andrews Decl., ¶4. beIN's growing audience includes over 55 million paid subscribers, and over 30 million social media followers.  First Andrews Decl., ¶5.  beIN invests substantially in its global intellectual property rights, and owns several registered trademarks to the word "BEIN."  First Andrews Decl., ¶6.  In the United States, beIN has registered the word mark "BEIN" (Reg. Nos. 4,665,444 and 5,332,353) as well as the stylized mark  (5,263,217) which shows lowercase "be" and capitalized "IN," consistent with beIN's logo commercially.  *Id.*  beIN also owns federally registered trademarks to "BEIN SPORT" (Reg. Nos. 5,070,475 and 5,066,623), "BEIN SPORTS" (Reg. No. 5,273,645), and "BEIN CONNECT" (Reg. No. 5,273,646).  *Id.*

Mr. Zicha, on the other hand, does not appear to use the <bein.com> domain names for any bona fide purposes.  Most of the <bein.com> domain names immediately redirect to <bein.com>. P.I. Mot. at 9; Zarouri Decl., ¶4.  And, according to the Internet Archive, the <bein.com> website has had no substantive uses since at least November of 2016.  P.I. Mot. at 9; Zarouri Decl., ¶3.  Instead, it has included some variation of "coming soon" or be back soon" with some click-advertisements.  P.I. Mot. at 9; Zarouri Decl., ¶¶3-4.  From at least December 4, 2017 to February 24, 2018, the <bein.com> website solicited offers for the <bein.com> domain names as well as other related "bein" domains.   P.I. Mot. at 4; Zarouri Decl., ¶3. Mr. Zicha is in the business of buying and selling domains; he incorporated a business entity called Buy Sell

Dns Ltd and he owns over 200 domains.  P.I. Mot. at 10; Zarouri Decl., ¶7. In an effort to extract

a higher value from beIN for his domains, Mr. Zicha intentionally registered domains including

the word "bein" plus another word  that directly corresponds to sectors of beIN's business:

"channel," "channels," "entertainment," and "films." P.I. Mot. at 10.  And as discussed below,

Mr. Zicha threatened to sell the <bein.com> domain names to beoutQ, an entity that illegally

pirates beIN's exclusive copyrighted content, unless beIN paid him a lot of money.  This is

exactly the type of conduct that is prohibited by the Anticybersquatting Consumer Protection Act

15 U.S.C. § 1125(d) ("ACPA"), which identifies nine factors that should be considered to

determine if the registrant is acting in "bad faith."  *See* P.I. Mot. at 7–11.

　　　As discussed in a front-page article in the New York Times on May 10, 2018, titled, "The

Brazen Bootlegging of a Multibillion-Dollar Sports Network," beoutQ is a sophisticated entity

with ties to Saudi Arabia that has been stealing beIN's exclusive copyrighted content.  Second

Andrews Decl., ¶23, Exhibit 1.  Other entities have also been targets of beoutQ's piracy,

including NBCUniversal, NBC Telemundo, and U.K.-based Eleven Sports.  Second Andrews

Decl., ¶24, Exhibit 2.  FIFA has also spoken on the issue, including in a recent statement calling

out beoutQ's illegal conduct and announcing it has engaged legal counsel to take legal action in

Saudi Arabia.  Second Andrews Decl., ¶25, Exhibit 3.  Another pirating entity, Arabic IPTV

provider Advanced TV Network, was recently subject to a criminal piracy action in Sweden,

resulting in a multi-million dollar award to beIN and prison sentences ranging from a year to two

and a half years.  Second Andrews Decl., ¶26, Exhibit 4.

　　　Therefore, on May 21, 2018, beIN filed this *in rem* action upon learning that Mr. Zicha

has been using the <bein.com> domain names in bad faith with the intent to profit, including by

threatening to sell the <bein.com> domain names before the World Cup to the pirate beoutQ.  On

May 24, 2018, beIN filed two additional *in rem* actions under the ACPA in Delaware and the

Southern District of California, naming additional "bein" domain names owned by Mr. Zicha

and registered to registrars located in those districts.  1:18-cv-00794-GMS (D. Del., filed May

24, 2018); 3:18-cv-01042-CAB-MDD (S.D. Cal., filed May 24, 2018).  As required by the

ACPA, each of the registrars in the three districts tendered to the court in that district complete

control and authority regarding the disposition of the domain names at issue in each of the three

*in rem* actions.  *See, e.g.*, ECF No. 17.

On May 31, beIN filed a motion for preliminary injunction and an emergency motion for

expedited hearing, requesting that the <bein.com> domain names be transferred to beIN

immediately.  ECF Nos. 8, 9.  beIN filed these motions in light of Mr. Zicha's threats to harm

beIN before the start of the World Cup on June 14 by selling the <bein.com> domain names to

beoutQ.  Hopwood Decl., ¶2.  The next day, the Court granted beIN's request for an expedited

hearing.  ECF No. 12.

Mr. Zicha was served with the complaint, motion for preliminary injunction, and order

setting the hearing for June 8, *see* ECF Nos. 10, 14–15, but Mr. Zicha never appeared in this

action and never responded to the complaint or motion for preliminary injunction.  Instead, Mr.

Zicha contacted beIN directly and asked to meet in person in London on June 5th (shortly before

the preliminary injunction hearing scheduled for June 8th).  The meeting took place at the offices

of Sidley Austin LLP in London.  Hopwood Decl., ¶2.  The meeting included Alastair Hopwood

from Sidley Austin LLP; Cameron Andrews, Senior Legal Counsel for beIN; Bhavesh Patel,

Global Digital Director for beIN; and Mr. Zicha.  Hopwood Decl., ¶¶3-4.  At the meeting, Mr.

Zicha stated that he had lied about his contacts with beoutQ, and stated that the reason he had

lied was to scare beIN into paying a large sum of money for ownership of the <bein.com>

domain names.  Hopwood Decl., ¶4; Second Andrews Decl., ¶27.  Mr. Zicha expressed regret for having lied about beoutQ.  *Id.*

In order to avoid further litigation — including the preliminary injunction hearing scheduled for three days later, statutory damages of up to $2.3 million under 15 U.S.C. § 1117(d) for the 23 "bein" domain names subject to litigation, and the risk of attorneys' fees and costs, *see, e.g.*, *Agri-Supply Co., Inc. v. Agrisupply.Com*, 457 F. Supp. 2d 660, 665–66 (E.D. Va. 2006) — Mr. Zicha orally agreed at the meeting on June 5th to transfer and assign all "bein" domain names and related social media accounts to beIN, including all of the <bein.com> domain names named as Defendants in this action.  Hopwood Decl., ¶5.  In exchange, beIN agreed to file stipulated judgments ending this case and two other cases in the United States without seeking costs or fees.  *Id.*

Shortly after the meeting, Mr. Hopwood sent an email to Mr. Zicha summarizing in writing the key points of the agreement.  Mr. Hopwood wrote:

- You agree to transfer and assign immediately all beIN-related domain names that you have registered, control, or own (including all domain names involved in the three lawsuits pending, all other beIN-related domain names worldwide, as well as all social media accounts using or incorporating the beIN name) to our client beIN.  You will execute all necessary documents, communicate with registrars, and cooperate in these transfers.

- The parties will immediately and jointly ask the Courts in the United States to stay all proceedings until the transfers of all the domain names is completed.

- Upon completion of the transfers and assignments of the domain names to beIN, the parties will file stipulated judgments with the Courts in these lawsuits, effectively ending the cases, with each side bearing its own fees and costs (meaning beIN will not try to recover its attorneys fees from you).

- There will be no financial or other compensation by beIN to you in connection herewith.  This agreement is in settlement of the disputes between the parties.

- You indicated (and in the written agreement you will warrant and represent) that you never had any contacts with beoutQ of

> any kind.  If, in future, you have any contacts with beoutQ, you
> will cooperate and provide copies of any and all such contacts
> to beIN and report those contacts to us immediately.

Hopwood Decl., ¶6, Exhibit 1.  The email concluded by stating, "We are preparing the formal

papers for this agreement. Please confirm immediately receipt of this email so that, if necessary,

we may inform the Courts that the parties have reached this settlement and resolution in

principle."  *Id.*

   Mr. Zicha responded to the email an hour later, stating "I agree."  Hopwood Decl., ¶7,

Exhibit 2.  Mr. Zicha also provided information that permitted beIN to take control of five "bein"

domain names not named in this litigation (because they were registered outside the U.S.), as

well as a "bein" Twitter account and a "bein" Facebook account.  *Id.*  Mr. Hopwood responded

thanking Mr. Zicha for confirming the agreement.  Hopwood Decl., ¶7, Exhibit 3.  A few

minutes later, Mr. Zicha sent another email acknowledging he would execute all necessary

documents, communicate with the registrars, and cooperate with the transfer of the "bein"

domain names to beIN, but he pointed out that some of the domain names had already been

"locked" by the registrar in response to the lawsuit.  Hopwood Decl., ¶8, Exhibit 4.  But Mr.

Zicha confirmed "I'll be here or after I lose access to the bein.com [domain] on

zicha.j@gmail.com if you need me."  *Id.*

   The next day, Mr. Zicha sent an email requesting to delay the transfer of

<beinhosting.com> and <beinservices.com> because he stated he has other domain names

(unrelated to "bein") that make use of those domains on the backend.  Hopwood Decl., ¶10,

Exhibit 5.  The next day on June 7, Mr. Patel reassured Mr. Zicha that beIN would work with

him to take over beinhosting.com "in a coordinated manner so that you can transfer unrelated

domains off it first."  Hopwood Decl., ¶11, Exhibit 6.

The next day was June 8th, which would have been the date that beIN's motion for preliminary injunction would have been heard.  Instead, as discussed above, beIN notified the Court that the parties had reached a settlement in principle, and the court issued a "Settlement Order of Dismissal."  Hopwood Decl., ¶12; ECF No. 18.

On June 12th, Mr. Zicha emailed Mr. Patel without copying beIN's in-house counsel or Sidley Austin.  Hopwood Decl., ¶14, Exhibit 9.  Mr. Zicha claimed that "I couldn't cope with the situation and tried to took my own life less than 48 hours from our meeting."  *Id.*  Mr. Zicha asked for "8-12 weeks to close everything down, before we can safely move everything to you." *Id.*  Mr. Patel immediately responded, "please focus on your recovery and stay strong.  I will review the below and come back to you."  *Id.*  Mr. Patel sent a second email to Mr. Zicha CC'ing Mr. Hopwood stating "I assure you that even after beIN takes possession of beinhosting.com and beinservices.com, beIN will not make any changes to the current setup of those domains for a reasonable time to give you a reasonable opportunity to transition your other websites to new locations."  *Id.*  Mr. Patel also reminded Mr. Zicha that "it is important that all of the 'bein' domains—including bein.com, beinhosting.com, and beinservices.com – are transferred to beIN now, as was previously agreed in London on June 5th (in lieu of proceeding with the preliminary injunction hearing before the Court in Boston)."  *Id.*

On June 21st, Mr. Zicha sent an email trying to renegotiate the agreement and setting forth arguments trying to justify why he would not cooperate with the transfer of the "bein" domain names.  Hopwood Decl., ¶15, Exhibit 10.  On June 22nd, Mr. Hopwood and Mr. Patel spoke with Mr. Zicha by telephone.  On the telephone call, Mr. Hopwood and Mr. Patel reiterated that under the agreement reached on June 5th, it was important that all the "bein" domain names be transferred to beIN without further delay.  Hopwood Decl., ¶17.  Mr. Hopwood

informed Mr. Zicha that a colleague would send him the formal settlement papers to sign.

Shortly after, Mr. Hopwood sent an email to Mr. Zicha with a CC to a colleague, Ted Chandler,

and Mr. Chandler emailed the formal settlement papers to Mr. Zicha.  Hopwood Decl., ¶18,

Exhibits 12-13.  Mr. Zicha did not sign the formal settlement papers and has refused to transfer

all of the <bein.com> domain names, directly contrary to the agreement reached on June 5th.

Hopwood Decl., ¶19.  Instead, a lawyer acting on behalf of Mr. Zicha agreed to transfer only the

"bein" domain names at issue in the Delaware and California *in rem* actions.  *Id.*, Exhibit 14.

But the lawyer, like Mr. Zicha, has refused to transfer many other "bein" domain names,

including those at issue in this action, in violation of the June 5th settlement agreement.  *Id.*

## III.    JURISDICTION

This Court retained jurisdiction to enforce this settlement agreement in its June 8, 2018,

Order of Dismissal, stating in relevant part, "this action is hereby dismissed without costs and

without prejudice to the right, upon good cause shown within sixty (60) days, to reopen the

action if settlement is not consummated." *See* ECF No. 18. Courts have explicitly held that a

"60-day order procedure has developed as a mechanism for the trial courts to bring cases to

closure while retaining jurisdiction to enforce a settlement for a period of time after closure is

announced." *Pratt v. Philbrook*, 109 F.3d 18, 21 n.5 (1st Cir. 1997); *see also Queens Syndicate

Co. v. Herman*, 691 F. Supp. 2d 283, 289 (D. Mass. 2010) (holding that the Court retained

jurisdiction during the 60-day order of dismissal period in order to ensure that a settlement was

enforced), *aff'd*, 652 F.3d 116 (1st Cir. 2011).

This Court also has *in rem* jurisdiction over the Defendant Domain Names under 15

U.S.C. § 1125(d)(2), *see* ECF No. 17, and thus this Court has the authority to transfer the

Defendant Domain Names to Plaintiff pursuant to the settlement agreement.  Congress

specifically provided for *in rem* jurisdiction in the ACPA for cases like this where the

cybersquatter is located outside the United States.  Congress noted that *in rem* actions of this

nature do "not offend due process, since the property and only the property is the subject of the

jurisdiction, not other substantive personal rights of any individual defendant."  H.R. Rep. 106-

412, 14.

Congress' stated purpose for providing *in rem* jurisdiction in these situations is to

"provide protection both for trademark owners and, perhaps more importantly, consumers."

H.R. Rep. 106-412, 14.  beIN is precisely in need of this protection.  beIN brought this action to

protect its trademark and to combat Mr. Zicha's bad faith efforts to extort money from beIN.

Mr. Zicha remains the registrant and owner of the <bein.com> domain names and is the sole

individual capable of settling this matter on behalf of the Defendant Domain Names.  beIN

provided Mr. Zicha with actual notice of this action concerning his domain names, *see* ECF Nos.

10, 14, 15, and in response Mr. Zicha agreed to transfer the Defendant Domain Names to

Plaintiff pursuant to the settlement agreement as described below.

## IV.    <u>ARGUMENT</u>

"A settlement agreement is a contract, and its enforceability is determined by applying

general contract law."  *Duff v. McKay*, 52 N.E.3d 203, 207 (Mass. App. Ct. 2016).  As with any

contract, the settlement agreement at issue in this case is enforceable if (1) the "terms are

sufficiently complete and definite," and (2) there was "a present intent of the parties at the time

of formation to be bound by those terms."  *Targus Grp. Int'l, Inc. v. Sherman*, 922 N.E.2d 841,

848 (Mass. App. Ct. 2010).  "Policy favors the enforcement of settlement agreements so as to

hold people to the contracts they make and to avoid costly and time-consuming litigation."

*Bistany v. PNC Bank, NA*, 585 F. Supp. 2d 179, 182 (D. Mass. 2008) (citing *T & T Mfg. Co. v.*

*A.T. Cross Co.*, 587 F.2d 533, 538 (1st Cir. 1978)).  The settlement agreement between beIN and Mr. Zicha should be enforced.

      **A.**      <u>**The Settlement Agreement is Complete and Contains All Material Terms**</u>

The first prong of the two part analysis to determine if the email between beIN and Mr. Zicha constitutes an enforceable agreement is whether the email is sufficiently complete and definite.  Courts have concluded that when parties agree via email to formalize an agreement through a signed settlement document in a subsequent writing, "the parties were proceeding to 'memorialize' or record the settlement terms, not to create them." *Basis Tech. Corp. v. Amazon.com, Inc.*, 878 N.E.2d 952, 959-61 (Mass. App. Ct. 2008) (holding email outlining six key settlement terms to which the other side responded "correct" was sufficiently complete and definite); *see also Duff*, 52 N.E.3d at 210.

Neither the email from Mr. Hopwood to Mr. Zicha, nor Zicha's responses that same day, suggested that there were any unresolved issues or that further negotiation was necessary.  Instead, Mr. Hopwood wrote "We are preparing the formal papers for *this* agreement," specifically referencing that the five material points of the agreement would be formalized.  Hopwood Decl., ¶6, Exhibit 1 (emphasis added).  To this, Mr. Zicha responded "I agree" and then proceeded to comply with the agreement by starting the transfer of several domain names.  Hopwood Decl., ¶7, Exhibit 2.

In a second email that same day, Mr. Zicha reaffirmed that he would execute all necessary documents, communicate with the registrar, and cooperate with the transfer of the domain names.  Hopwood Decl., ¶8, Exhibit 4.  Mr. Zicha's actions and further communications made clear his understanding that the agreement was reached.  The formal paperwork sent by beIN to Mr. Zicha several days later simply formalized the terms in the email and included the

documents to file with the Court in order to effectuate transfer of the locked domains and dismissal of the case. This is analogous to *Targus*, in which the Court determined that the addition of a term contemplating execution and exchange of final documents "in a *form* satisfactory to counsel" indicated that matters of content and substance had been resolved, and the parties were progressing to details of implementation.  Therefore, the settlement agreement was sufficiently complete and definite.

> **B.      The Final Settlement Agreement was Offered and Accepted and the Parties Intended to be Bound**

The second prong of the enforceability analysis looks to whether the parties had a present intent to be bound to the terms of the agreement at the time of formation.  To create an enforceable contract, the parties must have had the intention to be bound by their agreement at the moment of its formation.  *See Basis Tech*, 878 N.E.2d at 961.

Mr. Zicha's email response of "I agree" was acceptance of the terms in beIN's email. Hopwood Decl., ¶7, Exhibit 2.  Courts have routinely enforced settlements involving similar email confirmations.  *See, e.g.*, *Basis Tech*, 878 N.E.2d at 961 (finding email response "correct" was an unqualified acceptance of the terms in a previous email); *Kagan v. CitiMortgage, Inc.*, No. 2013-2933, 2015 WL 6872463, at *2-3 (Mass. Super. Oct. 21, 2015) (finding an email stating "[m]y clients have accepted the offer outlined in your email of today" constituted formation of an agreement on those outlined terms).  A reasonable person in beIN's position would have concluded that "I agree" means exactly that: agreement to the terms in the previous email in the string.  This is strong objective evidence of Mr. Zicha's intent to be bound to the settlement agreement.

In addition, both parties immediately began performing on the contract, which is further evidence of their intent to be bound.  After responding "I agree," Mr. Zicha immediately started

transferring domain names and social media accounts in accordance with the settlement agreement.  Hopwood Decl., ¶7, Exhibit 2.  beIN likewise began performing by informing the Court of the settlement, which led to the preliminary injunction hearing being cancelled and the Court dismissing the case with the right to reopen within 60 days if settlement was not consummated.  ECF No. 18.  This shows the parties' intent to be bound by the settlement agreement.  *Six Flags, Inc. v. Steadfast Ins. Co.*, 474 F. Supp. 2d 201, 207 (D. Mass. 2007) (finding a binding agreement existed because "[p]erhaps most importantly in this case, both sides evidenced an intent to be bound by the preliminary agreement by virtue of partial performance.").  A reasonable person would interpret this as conduct evidencing agreement.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, beIN respectfully requests that the Court enforce the June 5th settlement agreement by issuing an order directing the registrar to transfer the Defendant domain names to beIN without further delay, consistent with the *in rem* remedies provided by the ACPA, *see* ECF No. 17.

Dated: July 16, 2018                                        Respectfully submitted,

By:  /s/ Jack W. Pirozzolo
Jack W. Pirozzolo (Bar No. 56487)
jpirozzolo@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, Massachusetts 02109
Telephone:     (617) 223-0300
Facsimile:     (617) 223-0301

Peter H. Kang (*pro hac vice* forthcoming)
pkang@sidley.com
Ash Nagdev (*pro hac vice* forthcoming)
anagdev@sidley.com
SIDLEY AUSTIN LLP
1001 Page Mill Rd Bldg 1
Palo Alto, California 94304
Telephone:     (650) 565-7000
Facsimile:     (650) 565-7100


*Attorneys for Plaintiff*
*beIN Media Group LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 16, 2018, this document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and copies will be sent to those indicated as non-registered participants via U.S. Mail and email. Furthermore, service has been made by satisfying the requirements of 15 U.S.C. § 1125(d)(2)(A)(ii),(B).

/s/ *Jack W. Pirozzolo*

Jack W. Pirozzolo